DEHOOG, P.J.
*147 Defendant appeals his judgment of conviction for two counts of first-degree rape, ORS 163.375. He assigns error to the trial court's admission into evidence, over his hearsay and OEC 403 objections, of online and recorded conversations between the victim and himself.[1] In those conversations, defendant made arguably ambiguous statements of wrongdoing and told the victim that he would only discuss the details of her accusations in person; he also referred to having retained an attorney. He argues that (1) the victim's statements during the conversations were inadmissible hearsay not subject to any exception, OEC 802, and (2) the probative value of both the victim's and his own statements was substantially outweighed by the danger of unfair prejudice, OEC 403. We conclude that the victim's statements were not hearsay because they were not admitted for their truth but as necessary context for relevant, admissible statements by defendant; we further conclude that the trial court did not abuse its discretion under OEC 403 in admitting either the victim's or defendant's statements. We therefore affirm.
The following factual and procedural history is undisputed for purposes of appeal. In 2003, the victim, age 17, told a friend, M, that defendant, who was for a time her stepfather, had sexually abused her for over a decade. M persuaded the victim to report the abuse to an adult, who in turn notified the police. When the police subsequently contacted defendant, he retained an attorney; defendant was not, however, arrested or charged with any crime at that time. Six months later, defendant contacted the victim through online text messages. She notified a police officer, who encouraged her to continue communicating with defendant as a pretext to obtain evidence against him. In the months that followed, *148 the victim used the officer's computer to chat with defendant by text and spoke with defendant over the phone while police recorded their conversations. The communications were eventually admitted into evidence in their entirety: 23 double-spaced pages of chat messages, spanning more than two months, together with two half-hour telephone recordings.
Defendant initially obtained an order suppressing his own statements on the grounds that the police had violated his right against *732 self-incrimination and right to counsel under the Oregon Constitution. The Supreme Court subsequently held that the statements were constitutionally admissible, but did not address their admissibility under the Oregon Evidence Code. See State v. Davis , 350 Or. 440, 256 P.3d 1075 (2011) ( Davis I ). On remand following that decision, defendant filed a motion in limine , challenging as inadmissible hearsay the "pretext" communications between the victim and defendant. He argued that the victim's statements during the conversations were hearsay because they were out-of-court assertions offered to prove the truth of the matter asserted, OEC 801(3), and did not fall within the "adoptive admission" hearsay exclusion, which renders a statement admissible against a party when "the party has manifested the party's adoption or belief in its truth," OEC 801(4)(b)(B). Defendant also objected under OEC 403, arguing that "the probative value of the challenged recorded pretext communications, [which] is that the defendant failed to deny allegations of misconduct during those communications, has only marginal relevance, but a great likelihood that such silence would be misused by the jury in a manner that would substantially prejudice the defendant," especially in light of defendant's recorded references to having hired an attorney.
The trial court ruled that both the text and recorded phone conversations were admissible, but that the victim's statements would be admitted only as context, not for their truth as adoptive admissions by defendant. Regarding defendant's argument that the evidence was unduly prejudicial under OEC 403, the court reasoned that defendant's refusal to respond to some of the victim's statements over the phone indicated consciousness of guilt, and that the conversations as a whole did not create unfair prejudice:
*149 "[Defendant] is making an assertion, one of which I recall is of the nature, I'm not going to talk to you about this on the phone; I'm willing to talk to you about this in person. And, thus, awareness that there is in fact-and there's some statement indicating awareness that he might well be recorded on the telephone and would not be recorded in person, an unwillingness to subject himself to that. The inference is clearly there. That's relevant. That's consciousness of some guilt on his part. It is relevant. The State-it's a balancing test. The State is in need of the evidence. Yeah, it's-it has some weight against the Defendant, but it's not unfairly prejudicial in the Court's view."
The court stated that the evidence would be admitted "contingent upon the State proposing an appropriate cautionary instruction" to make clear that the jury could not consider the victim's statements for their truth.
The state introduced the conversations through the investigating officer, who explained that, in a pretext conversation, an alleged victim will refer to the allegation "in a context or in a way that will hopefully induce the suspect to either affirm it or not deny it or flat out refute it." Defendant objected when the state offered that evidence, referencing his motion in limine . The court instructed the jury that the victim's statements were presented only as context:
"You're not to consider the truthfulness of those statements in your deliberation. They are just there for explanation of the context, and you're not to consider the truthfulness of them. They're admitted not for the truth of the assertions made by [the victim] but as for purposes only of seeing [defendant's] response, and that's the reason for their admission."
The officer read into evidence part of defendant's text conversation with the victim:[2]
"[VICTIM]: maybe we could hang out while you're here?
"[DEFENDANT]: yeah if you are comfortable with that I like to see you *150 "[VICTIM]: yeah ...I think it'd be cool ...I miss you ...no sex though ...we did enough of that ...hehe
"[DEFENDANT]: I not gonna answer that brat. lol *733 "[VICTIM]: we gotta be able to joke about sometime...I'm ok with everything now ...
"[DEFENDANT]: lol yeah
"[VICTIM]: so you'd be ok with just hanging out
"[DEFENDANT]: yeah why not we use to just hang out too
"[VICTIM]: yeah, but a lot of time that we hung out there was other sexual stuff going on and I wanted to make sure that part of our relationship was over ...because I really do miss you
"[DEFENDANT]: yeah I miss you to, nothing to worry about
"[VICTIM]: ok ...if I am being to forward let me know. I just thought tiptoeing around it was stupid
"[DEFENDANT]: it's all good
"* * * * *
"[DEFENDANT]: so are we on the up in up here
"[VICTIM]: ? ? lol meaning?
"[DEFENDANT]: look this was a bad situation that went on. I guess I just want to know if you're really sincere on what you're saying to me
"[VICTIM]: like that I'm ok with all of it now?
"[DEFENDANT]: well how you really feel I guess. you not setting me up here
"[VICTIM]: lol...no I mean it ...I miss you and hope that we can start over
"[DEFENDANT]: ok. I will take your word"
(Emphases added.)
The state then played the two telephone conversations for the jury. In the first call, the victim and defendant discussed her accusations and how the investigation *151 had cooled off (so far as defendant was aware), which led to defendant's first mention of his attorney:
"[VICTIM]: * * * Do you get hounded at all? Like, have they talked to you at all? Because I haven't heard like anything from it. They-
"[DEFENDANT]: No. I got a lawyer and everything. My lawyer contacted them, so anything that went through went through him.
"[VICTIM]: Oh, really?
"[DEFENDANT]: They didn't even talk to me. Because I talked to him like three or four times in the beginning, and he just kept saying, well, you know, we're just going to investigate this and go through the steps. And he says, whenever I talk to you, I'll talk to you. That's all he-that's the last time-that was the last time I talked to him, and I never heard nothing from him again."
Later in the call, after the victim remarked that she sometimes regretted having accused defendant, he responded in a manner that the state contends revealed a guilty conscious:
"[VICTIM]: [I've stopped] letting [M] control my life. That was, you know, a big part of it.
"[DEFENDANT]: I don't know. That whole situation was wrong. You know, everything . * * * But, I don't know, I ain't going to worry about-I'm not going to dwell on it now. I mean, I'm glad to talk to you. * * *
"[VICTIM]: Yeah. Were you mad at me at all?
"[DEFENDANT]: Well, yeah. I don't know if it was so much mad. I don't know. I just-there was a lot of mixed feelings there. I guess there was just-I don't know. More than anything I just-I actually couldn't believe that what actually all went down happened. You know, it was hard to-it was hard to accept it, but, you know, there was no controlling it. Yeah?
"* * * * *
"[VICTIM]: And like the biggest problem I had with it all was like towards the end when like I just didn't want to do it anymore and like, I don't know, you changed like into *152 a different person. Like anything I would say you would be mean.
"[DEFENDANT]: I wasn't a good person . In fact, I was a-I was in a different world. I'll admit it, you know? And you look back and you think how stupid you were and stuff, but, you know, I-it was *734 just mistakes on my part . Like I say, I should have been a different person, and I should have let you lead your life how you wanted to, too, you know? That was wrong for me . I don't know.
"[VICTIM]: Well, do you think that maybe later on after, you know, we've been able * * * to talk a few times that we could hang out without having the same thing?
"[DEFENDANT]: All right[,] that's something in the past, and I am sure it would not even be a problem, you know?
"* * * * *
"[VICTIM]: So no more sex ?
"[DEFENDANT]: Heh-heh-heh. You know, you really-you know, I'm not even [going to] go with that stuff. Just quit it. I'm not going to even answer to that stuff . If you want to talk to me sometime face to face on stuff like that, I'll do it. I don't have a problem with it * * * but I ain't going to do it over the phone. I can't do that."
(Emphases added.)
In the second telephone conversation, the victim told defendant that she was considering telling the police that she had lied about the abuse. Defendant again declined to discuss the issue over the telephone:
"Like, I don't mind-this is hard for me to-you know, it's hard for me to want to talk on the phone and say anything about this . I don't know if you understand that or not. * * * [Y]ou can do whatever you need to do there and whatever you want to do there, but as far as really talking about anything or saying anything on the phone, I'm not going to do that. I mean, if it's in person or whatever or do something else, I will, but it's just-that's a tough situation. I hope you understand that."
(Emphasis added.) In addition to the foregoing, defendant referenced his attorney several more times, each time stating *153 that his attorney was handling any interaction with the police on his behalf.
Defendant testified at trial and denied the allegations. He explained that, in the recorded conversations, he had said that he "wasn't a good person back then" because he "should have just been more lenient [with the victim], gave her more space." When asked why he was unwilling to talk about certain subjects over the phone, defendant replied, "Because I wanted to talk to her face to face. I wanted to know why she did what she did. * * * Over the phone I don't think I would have gotten a truthful answer."
The trial court twice more indicated that the jury was not to consider the victim's recorded statements as substantive evidence. First, when defense counsel objected to the state's characterization of the statements in closing argument, the court sustained the objection and explained: "The response is what you need to be focusing on. I'll sustain the objection. You need to focus on his response." Second, the court gave the jury a cautionary instruction:
"During the course of this trial you have heard out-of-court statements made by both [the victim] and the defendant during telephone calls and online conversations. The statements made by [the victim] during these conversations were offered only to show the context of the defendant's-or the context of the statements by the defendant. The statements made by [the victim] during the course of those telephone calls and online conversation must not be used for the proof of any of the statements made by [the victim] in those conversations."
The jury convicted defendant of two counts of first-degree rape and was unable to reach a verdict on two other counts, which the court therefore dismissed.
We turn to the parties' arguments regarding the admissibility of the text and recorded conversations. Beginning with defendant's hearsay argument, he contends on appeal that the victim's statements are hearsay because the state "offered those statements for their truth, that is, that defendant and [the victim] had sexual contact in the past." Defendant argues that those hearsay statements were inadmissible because they do not meet the requirements *154 for adoptive admissions under OEC 801(4)(b)(B). The state responds that whether or not the victim's statements are admissible nonhearsay under OEC 801(4)(b)(B) is beside the point, *735 because the trial court did not admit them for their truth; instead, the court admitted them solely for the purpose of establishing context for defendant's statements or to establish their effect on defendant.[3]
We agree with the state that it is immaterial whether the victim's statements qualify as adoptive admissions under OEC 801(4)(b)(B), because those statements were not admitted for their truth. As noted, the trial court specifically instructed the jury that it had admitted the victim's statements "only to show the context" of defendant's statements, and not for their truth. Accordingly, the proper inquiry is whether the court's stated reason for admitting the evidence-to provide context for defendant's statements-was a legitimate, nonhearsay purpose for that evidence under the circumstances of this case. We review the court's conclusion that the evidence was admissible for that purpose for legal error. See State v. Hartley , 289 Or.App. 25, 29, 407 P.3d 902 (2017) (whether evidence is admissible is a question of law).
Although defendant focuses his argument on whether the disputed statements qualify as nonhearsay under the exclusion for adoptive admissions, we understand his argument to be somewhat broader. That is, we understand defendant to contend that, because those statements can only be understood to have been admitted for their truth-notwithstanding the trial court's clear instructions to the contrary-they must be excluded as hearsay. Defendant does not dispute that a statement properly admitted for some purpose other than the truth, such as to show context or a relevant effect on the listener, may be admissible over a hearsay objection. See OEC 801(3) (defining "hearsay" as an out-of-court statement "offered in evidence to prove the truth of the matter asserted"); see also Laird C. Kirkpatrick, Oregon Evidence § 801.01[3][d][iii] (6th ed. 2013) (identifying *155 certain well-established, nonhearsay uses for out-of-court statements, including a statement's effect on a listener). He contends, however, that the victim's statements do not satisfy any other such purpose.
In support of that contention, defendant argues that this case cannot be distinguished from the Supreme Court's recent decision in State v. Schiller-Munneman , 359 Or. 808, 377 P.3d 554 (2016), in which the court held that similar statements of a victim were inadmissible hearsay despite the state's contention that they had not been admitted for their truth.[4] For several reasons, we conclude that defendant's reliance on that decision is misplaced. In Schiller-Munneman , the state prosecuted the defendant for first-degree rape after the victim reported that he had sexually assaulted her while she was passed out on his couch following an evening of drinking. 359 Or. at 810, 377 P.3d 554. As here, the victim in that case sent the defendant text messages in an effort to obtain an incriminating response. Id. In part, one message asked, "why did [you] do that to me?" Another asked, "what made what [you] did ok?" Id. Unlike defendant in this case, however, the defendant in Schiller-Munneman did not respond to either message. Id.
In relevant part, the Supreme Court considered whether the victim's texts and the defendant's nonresponse, both of which the trial court had admitted into evidence, constituted inadmissible hearsay. Id. On review, the state argued that the victim's texts were not hearsay, either because they contained no assertive conduct or because they were offered only to show "their effect on defendant," not their truth. Id. at 815, 377 P.3d 554. And, the state argued, to the extent that the defendant's nonresponse was a "statement," it was an admissible admission of a party opponent under OEC 801(4)(b)(A). Id.
In addressing those arguments, the Supreme Court first explained that the circumstances required it to consider the text messages and the defendant's nonresponse *156 "in *736 combination and as a whole." Id. at 815-16, 377 P.3d 554. That was because neither aspect of the evidence was relevant without the other. Id. at 816, 377 P.3d 554. The court proceeded to reject the state's primary argument that, because the victim's messages contained questions, they, by definition, could not be assertions. Id. at 816-17, 377 P.3d 554. The court reasoned that, in the context of other evidence and the arguments made at trial, the texts asserted that defendant did something wrongful against the victim's wishes. Id. at 817, 377 P.3d 554. Thus, either expressly or implicitly, the messages contained assertions and were therefore "statements" within the meaning of OEC 801. Id.
Next the Supreme Court rejected the state's alternative argument that, to the extent that the texts contained assertions, they were admissible because they were offered only to show their effect on the defendant, and not the truth of the assertions themselves. Id. ; see OEC 801(3). The court acknowledged that "[a]n out-of-court statement is not hearsay if it is offered to show the statement's effect on the listener, and the effect on the listener is relevant." Id. (citing Kirkpatrick, Oregon Evidence § 801.01[3][d] at 705). And, in the state's view, that effect was relevant, because "[a]n innocent person 'would not have simply ignored those messages.' " Id. at 818, 377 P.3d 554.
In rejecting that argument, the court reasoned that either the evidence had been offered to prove the truth of the matter it asserted in violation of the hearsay rule or it was not relevant. Id . In other words, because the state had not satisfactorily explained how the texts were relevant in any way other than to prove that the defendant was guilty of rape-i.e. , the truth of the matter asserted in those texts-the messages were not relevant for any nonhearsay use and so were inadmissible. Id. The Supreme Court reasoned that, because the trial court in that case had found, as a factual matter, that the defendant's silence did not constitute an adoptive admission, the state could not rely on that separate theory of relevance for the disputed texts. Id. at 818-19, 377 P.3d 554 ; see also id. at 814, 377 P.3d 554 (explaining that, in light of that factual finding, the trial court should have ruled that the text messages and the defendant's failure to respond to them were not admissible as an adoptive admission under OEC 801 (4)(b)(B) ).
*157 The evidence introduced in the instant case has certain similarities to the evidence in Schiller-Munneman ; it also, however, has significant differences. As noted, the defendant in Schiller-Munneman did not respond to the accusations of the victim in that case; in this case, defendant did respond, albeit somewhat ambiguously. Relatedly, even though the state relied on the victim's statements to provide context for defendant's statements, his statements-unlike the defendant's nonresponse in Schiller-Munneman -were not entirely dependent upon the victim's statements to have evidentiary value. See Schiller-Munneman , 359 Or. at 818, 377 P.3d 554 (focusing, for that reason, on whether there was any other relevant effect on the defendant that was not dependent upon the truth of the victim's statements). Finally, in contrast to the statements of the victim in Schiller-Munneman , the statements of the victim here did have "another [relevant] effect" on defendant that was not dependent upon the truth of those statements. See id. That is, whether or not the victim's allegations were true, they provided explanatory context for defendant's otherwise ambiguous statements that it "was a bad situation that went on," that the "whole situation was wrong," that he "wasn't a good person," and that he would only be willing to discuss the victim's allegations in person, not over the phone.
In light of those distinctions, we disagree with defendant's contention that Schiller-Munneman dictates the outcome here, and, instead, find better guidance in cases such as State v. Voits , 186 Or.App. 643, 654, 64 P.3d 1156, rev. den. , 336 Or. 17, 77 P.3d 320 (2003), cert. den. , 541 U.S. 908, 124 S.Ct. 1612, 158 L.Ed.2d 253 (2004). In Voits , the state offered letters written by the murder victim to rebut the defendant's argument that the victim had committed suicide. Many of the victim's statements were admissible as evidence of the victim's state of mind, see OEC 803(3), but the defendant argued that other material in the letters offered as context and background *737 was irrelevant hearsay. Voits , 186 Or.App. at 652-59, 64 P.3d 1156. We first held that, "[a]lthough the contextual material itself had limited, if any, independent relevance to an issue in the case," it was relevant "because it assisted in establishing the relevance of the victim's declarations of her own state of mind or future intentions." Id. at 655, 64 P.3d 1156 (emphasis in original). We reasoned *158 that, because the contextual material was not itself "direct [or] circumstantial evidence of the victim's state of mind or future intentions, and therefore was not offered to prove the truth of the matters asserted," it "was not hearsay"; as a result, it was unnecessary to determine whether the additional contextual statements satisfied the hearsay exception for a declarant's state of mind. Id. at 658, 64 P.3d 1156. Instead, we concluded, it was appropriate to admit that contextual evidence for the value it had as an aid to understanding the victim's other statements. Id.
The Supreme Court's decision in State v. Chandler , 360 Or. 323, 380 P.3d 932 (2016), similarly supports the conclusion that the victim's statements were admissible as context for defendant's statements. In Chandler , the Supreme Court held that out-of-court statements were relevant, not for their truth, but to provide context, and therefore admissible over the defendant's argument that the statements constituted improper vouching evidence. Id . at 339, 380 P.3d 932. In that case, the trial court admitted into evidence a recorded interview of the defendant in which the investigating officer repeatedly indicated that she believed that the victims were truthful and that the defendant was not. The defendant argued that the officer's statements constituted impermissible vouching evidence and should have been redacted. Id. at 329, 380 P.3d 932. The Supreme Court rejected that argument and held that a statement "is subject to the categorical prohibition against vouching evidence only if the statement is offered for the truth of the credibility opinion that it expresses." Id. at 334, 380 P.3d 932.[5] The trial court had not erred because the disputed statements were admitted "not to prove that defendant was untruthful or that the victims were truthful, but rather as context for the responses that those statements elicited from defendant ." Id. at 335, 380 P.3d 932 (emphasis added); accord. State v. Codon , 282 Or.App. 165, 173-74, 386 P.3d 45 (2016), rev. den. , 361 Or. 240, 392 P.3d 324 (2017) (noting the trial court's limiting jury instruction and the lack of emphasis placed upon the vouching statements at trial).
*159 As in Voits and Chandler , we conclude that the victim's statements in conversation with defendant were themselves admissible as nonhearsay context for defendant's admissible statements. That is, we agree with the state that the holding in Schiller-Munneman "is inapplicable when, as here, a defendant has made statements himself and the substance of those statements was admissible in evidence." And we disagree with defendant's argument that his statements were the equivalent of formal silence.[6] Rather, defendant's statements here were relevant because a reasonable fact-finder could interpret them as expressing consciousness of guilt, and they were admissible as defendant's prior statements under OEC 801(4)(b)(A).
Furthermore, we are not persuaded that the victim's statements must be viewed as having been admitted for their truth because they included the victim's direct allegations against defendant. The Supreme Court has expressly declined to adopt a categorical approach that would classify statements as hearsay, even if not offered for their truth, if the statements include "definite complaints of a particular crime by the accused," such that the statements would be "likely to be misused by the jury as evidence of the fact asserted." State v. Mayfield , 302 Or. 631, 641, 733 P.2d 438 (1987) (internal quotation *738 marks omitted). Instead, "when the nonhearsay statements reach this level they should not be converted from nonhearsay to hearsay," but should be evaluated for prejudice under OEC 403. Id.
Appropriately, then, we now turn to defendant's argument under OEC 403 that the trial court erred because the probative value of the communications is substantially outweighed by the danger of unfair prejudice. We review a trial court's decision to admit evidence over an OEC 403 objection for abuse of discretion. State v. Serrano , 355 Or. 172, 192, 324 P.3d 1274 (2014), cert. den. , --- U.S. ----, 135 S.Ct. 2861, 192 L.Ed.2d 899 (2015). Our review is purposely deferential to the trial court, which is better positioned to evaluate the need for evidence and attendant prejudice; the court abuses its discretion *160 when it reaches "an end not justified by, and clearly against, evidence and reason" or makes a determination "outside the range of legally permissible outcomes." State v. Sewell , 257 Or.App. 462, 469, 472, 307 P.3d 464, rev. den. , 354 Or. 389, 315 P.3d 420 (2013) (internal quotation marks omitted).
In determining whether the trial court abused its discretion, we follow the Supreme Court's analytical framework in Mayfield , 302 Or. at 645, 733 P.2d 438 :
"First, the trial judge should assess the proponent's need for the * * * evidence. In other words, the judge should analyze the quantum of probative value of the evidence and consider the weight or strength of the evidence. In the second step the trial judge must determine how prejudicial the evidence is, to what extent the evidence may distract the jury from the central question whether the defendant committed the charged crime. The third step is the judicial process of balancing the prosecution's need for the evidence against the countervailing prejudicial danger of unfair prejudice, and the fourth step is for the judge to make his or her ruling to admit all the proponent's evidence, to exclude all the proponent's evidence or to admit only part of the evidence."[7]
At the outset, we agree with the state that defendant's statements were relevant evidence of his consciousness of guilt. That is, the jury may reasonably have viewed defendant's statements-that he "wasn't a good person," that "it was just mistakes on [his] part," and that "it was wrong for [him]"-to be, in essence, admissions of criminal wrongdoing, all directly responsive to the victim's statement that she "just didn't want to do it anymore." Similarly, defendant's expressed unwillingness to discuss the victim's allegations over the phone could reasonably be seen as reflecting defendant's awareness of his potential liability for what he had done. Viewed in that light, and in a trial that was essentially a credibility contest between defendant and the victim, that evidence had substantial probative value.
Defendant argues that any such probative value is outweighed by its prejudice. He points particularly to "the *161 ambiguity of the statements and the unfairly prejudicial reference to defendant's exercise of important constitutional rights," i.e. , his decision to hire an attorney in relation to the investigation and his refusal to discuss some topics over the phone. Our conclusion above largely forecloses defendant's contention that his alleged admissions of wrongdoing-such as that the "whole situation was wrong" and that he "wasn't a good person"-were so ambiguous as to be, in the context of the victim's statements, more prejudicial than probative. As we have just observed, the jury may reasonably have understood defendant's statements to be acknowledgments that he had sexually abused the victim. And, to the extent that there was any question as to what, exactly, defendant intended by those statements, they were not so removed from the material issues at trial as to "improperly appeal[ ] to the preferences of the trier of fact for reasons that are unrelated to the power of the evidence to establish a material fact." Sewell , 257 Or.App. at 469, 307 P.3d 464.
Defendant also argues that he was unduly prejudiced by the admission of evidence that he refused to respond to some of the victim's *739 statements and made references to an attorney, both of which, he contends, "encroached on [his] right to counsel." In response, the state does not overtly dispute that that evidence was potentially prejudicial, nor could it reasonably argue that point. Although defendant's right to counsel under Article I, section 11, of the Oregon Constitution had not yet attached at the time of defendant's conversations with the victim, see Davis I , 350 Or. at 478-79, 256 P.3d 1075 (reversing, for that reason, the trial court's suppression of the defendant's statements), defendant's statements nonetheless had the potential to prejudice him. Much like evidence of a defendant's post-arrest silence or request for counsel, that evidence could allow the state to "benefit from the improper * * * inference that a defendant who invokes his right to counsel is guilty of the charged offense." See State v. Nulph , 31 Or.App. 1155, 1162, 572 P.2d 642 (1977), rev. den. , 282 Or. 189 (1978). And, because a defendant's silence "may simply be a product of the exercise of the right to remain silent, * * * it is speculative to infer that the defendant remained silent because he or she is guilty." State v. Clark , 233 Or.App. 553, 559, 226 P.3d 120 (2010) ; see also *162 Schiller-Munneman , 359 Or. at 818, 377 P.3d 554 (explaining that silence in response to questioning is irrelevant unless the requirements for an adoptive admission under OEC 801(4)(b)(B) are met).
Even in the constitutional context, however, "[t]he erroneous admission of evidence that a defendant invoked his right to counsel is not necessarily prejudicial" and so does not invariably require reversal. Nulph , 31 Or.App. at 1163, 572 P.2d 642. Similarly, defendant's statements here are not necessarily prejudicial, much less substantially more prejudicial than probative. The essence of defendant's reference to an attorney was that his attorney was communicating with the police on his behalf; defendant told the victim, however, that he had spoken to the police investigator himself "three or four times." Thus, the trial court could reasonably have considered defendant's reference to an attorney here to be less prejudicial than a refusal to speak without the assistance of counsel in the course of police questioning. And, as to the purported exercise of defendant's right to remain silent, defendant was not silent in response to the victim's statements; instead, when the victim confronted defendant with such statements as, "So no more sex?," defendant responded that he would only talk "face to face on stuff like that." That response did not suggest defendant's desire to exercise his right to remain silent; rather, in light of defendant's earlier concern that the victim was "setting [him] up," it merely suggested that defendant did not want his statements to be recorded or overheard by anyone else.
Our view is no different as to the potential prejudice inherent in the victim's statements. Although defendant does not expressly argue the point, we recognize the risk that, even if not admitted for their truth, statements that allege that a defendant has committed a particular crime may be misused by the jury as substantive evidence of guilt. See Mayfield , 302 Or. at 641, 733 P.2d 438. Here, however, the victim's allegations during the conversations were far less detailed than her testimony at trial and placed no additional information before the jury. Cf. id. at 641-42, 733 P.2d 438 (prejudice arose when challenged evidence included graphic description of uncharged sexual abuse). Moreover, the trial court repeatedly instructed the jurors that they were not to consider the victim's statements as evidence of defendant's guilt; those *163 instructions helped to minimize any prejudicial effect her statements might otherwise have had. See Voits , 186 Or.App. at 660, 64 P.3d 1156 (noting that a limiting instruction "often is an appropriate means to safeguard against jury misuse of evidence" that is not admitted for its truth).
Finally, as to the balancing of those considerations under Mayfield , we again note the state's need for the evidence, given the central role that credibility played in defendant's trial, as well as the absence of any argument by defendant that the trial court failed to conduct the balancing required by Mayfield . Even taking into account the potentially prejudicial effect of both defendant's and the victim's statements, we conclude that, in light of the probative value of that evidence and the state's need for it, the trial court did not err in admitting the conversations in their *740 entirety as evidence of defendant's consciousness of guilt. Regardless of whether this court, if presented with the matter in the first instance, might have "struck the discretionary balance differently," Sewell , 257 Or.App. at 472, 307 P.3d 464, we cannot say that the trial court abused its discretion.
Affirmed.

Defendant specifically assigns error to the court's denial of his motion in limine to exclude the conversations from evidence and to the court's overruling of his objection to the evidence. We reject without discussion defendant's additional assignment of error, challenging the sufficiency of the court's limiting instruction on the challenged evidence. Defendant did not offer any argument on that assignment of error, and "it is not this court's function to speculate as to what a party's argument might be * * * [or] to make or develop a party's argument when that party has not endeavored to do so itself." See Beall Transport Equipment Co. v. Southern Pacific , 186 Or.App. 696, 700 n.2, 64 P.3d 1193, adh'd to on recons. , 187 Or.App. 472, 68 P.3d 259 (2003).

For the sake of readability, we have made some minor omissions and corrections in the messages without altering their content or tenor.

Defendant does not dispute that his own statements plainly fall within the hearsay exclusion in OEC 801(4)(b)(A) : "A statement is not hearsay if * * * [t]he statement is offered against a party and is * * * that party's own statement[.]"

The Supreme Court issued its decision in Schiller-Munneman after briefing in this case was complete. We take the parties' arguments regarding the significance of that decision from the memorandum of additional authorities and related response.

The Supreme Court noted that such evidence must still be relevant under OEC 401 and must not be unduly prejudicial under OEC 403, and that a defendant may request a limiting instruction under OEC 105. Chandler , 360 Or. at 334, 380 P.3d 932.

The Supreme Court in Schiller-Munneman explicitly distinguished its earlier opinion in this case, Davis I , noting that the defendant in Schiller-Munneman "did not answer the questions asked; he remained silent." 359 Or. at 812, 377 P.3d 554 (citing Davis I , 350 Or. at 443, 256 P.3d 1075 ).

Defendant does not argue that the trial court's on-the-record reasoning is insufficient to demonstrate that the court engaged in the analysis required by Mayfield .